UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────

REBECCA N. DRABCZYK,

                              Plaintiff,      18-CV-355-FPG

v.                                    DECISION AND ORDER

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
───────────────────────────────

**INTRODUCTION**

On March 13, 2014, Plaintiff protectively filed applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") alleging disability beginning on November 10, 2012. Tr.[1] 107-08. After the applications were denied, Plaintiff timely requested a hearing. Tr. 127-29. On June 13, 2016, Plaintiff appeared with her counsel, Felice A. Brodsky, Esq., and testified at a hearing before Administrative Law Judge Lynette Gohr ("the ALJ"). Tr. 58-92. Sheryl Bustin, the Vocational Expert ("VE"), also testified at the hearing. Tr. 85-92. The ALJ issued an unfavorable decision on November 17, 2016. Tr. 11-27. Plaintiff then timely requested review by the Appeals Council, and on January 16, 2018, the Appeals Council denied review making the ALJ's decision the final decision of the Commissioner of Social Security ("the Commissioner"). Tr. 1-6. Plaintiff subsequently filed this lawsuit pursuant to Titles II and XVI of the Social Security Act (the "Act") seeking review of the final decision of the Commissioner denying her applications for SSI and DIB.[2] ECF No. 1. Presently before the Court are the parties' competing motions for judgment on the pleadings. ECF Nos. 16, 18. For the reasons that follow,

───────────────────────

[1] "Tr." refers to the administrative record in this matter. ECF No. 5.

[2] The Court has jurisdiction over this action under 42 U.S.C. §§ 405(g); 1383(c)(3).

1

Plaintiff's motion for judgment on the pleadings (ECF No. 16) is GRANTED, the Commissioner's motion (ECF No. 18) is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this Decision and Order.

## LEGAL STANDARD

### I. District Court Review

The scope of this Court's review of the ALJ's decision denying benefits to Plaintiff is limited. It is not the function of the Court to determine *de novo* whether Plaintiff is disabled. *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447 (2d Cir. 2012). Rather, so long as a review of the administrative record confirms that "there is substantial evidence supporting the Commissioner's decision," and "the Commissioner applied the correct legal standard," the Commissioner's determination should not be disturbed. *Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007), *cert. denied*, 551 U.S. 1132 (2007). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault*, 683 F.3d at 447-48 (internal citation and quotation marks omitted). "Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (internal quotation marks omitted).

### II. Disability Determination

An ALJ must follow a five-step sequential evaluation to determine whether a claimant is disabled within the meaning of the Act. *See Parker v. City of New York*, 476 U.S. 467, 470-71 (1986). At step one, the ALJ must determine whether the claimant is engaged in substantial gainful work activity. *See* 20 C.F.R. § 404.1520(b).[3] If so, the claimant is not disabled. If not,

---

[3] Because the DIB and SSI regulations mirror each other, the Court only cites the DIB regulations. *See Chico v. Schweiker*, 710 F.2d 947, 948 (2d Cir. 1983).

2

the ALJ proceeds to step two and determines whether the claimant has an impairment, or combination of impairments, that is "severe" within the meaning of the Act, meaning that it imposes significant restrictions on the claimant's ability to perform basic work activities. *Id.* § 404.1520(c). If the claimant does not have a severe impairment or combination of impairments, the analysis concludes with a finding of "not disabled." If the claimant does, the ALJ continues to step three.

At step three, the ALJ examines whether a claimant's impairment meets or medically equals the criteria of a listed impairment in Appendix 1 of Subpart P of Regulation No. 4 (the "Listings"). *Id.* § 404.1520(d). If the impairment meets or medically equals the criteria of a Listing and meets the durational requirement, *id.* § 404.1509, the claimant is disabled. If not, the ALJ determines the claimant's residual functional capacity ("RFC"), which is the ability to perform physical or mental work activities on a sustained basis, notwithstanding limitations for the collective impairments. *See id.* § 404.1520(e)-(f).

The ALJ then proceeds to step four and determines whether the claimant's RFC permits him or her to perform the requirements of his or her past relevant work. 20 C.F.R. § 404.1520(f). If the claimant can perform such requirements, then he or she is not disabled. *Id.* If he or she cannot, the analysis proceeds to the fifth and final step, wherein the burden shifts to the Commissioner to show that the claimant is not disabled. *Id.* § 404.1520(g). To do so, the Commissioner must present evidence to demonstrate that the claimant "retains a residual functional capacity to perform alternative substantial gainful work which exists in the national economy" in light of his or her age, education, and work experience. *See Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999) (quotation marks omitted); *see also* 20 C.F.R. § 404.1560(c).

## DISCUSSION

### I.  The ALJ's Decision

The ALJ analyzed Plaintiff's claims for benefits under the process described above. At step one of the sequential analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since November 10, 2012, the alleged onset date. Tr. 13. At step two, the ALJ found that Plaintiff suffered from several severe impairments: postural orthostatic tachycardia syndrome (POTS),[4] Ehlers-Danlos Syndrome Type III,[5] irritable bowel syndrome (IBS), gastroparesis, migraines, and obesity. *Id.* The ALJ determined that Plaintiff's endometriosis, obstructive sleep apnea, hypothyroidism, depressive disorder, and anxiety were non-severe impairments. Tr. 14.

The ALJ proceeded to the third step of the analysis and found that the severity of Plaintiff's impairments did not meet or equal the criteria of any listing. Tr. 15, 16. She then determined that Plaintiff retained the RFC to perform sedentary work with occasional stooping, crouching, kneeling, crawling, and climbing ramps and stairs. Tr. 16. The ALJ also determined that Plaintiff must be able to sit and stand at will while remaining on task, avoid concentrated exposure to extreme heat, refrain from working at unprotected heights and around moving mechanical parts,

---

[4] POTS is a condition that affects circulation of blood, which is associated with the development of symptoms that occur when standing up from a reclining position and that may be relieved by sitting or lying back down. The primary symptom of POTS is lightheadedness, fainting, and an uncomfortable, rapid increase in heartbeat, as well as chest pain, exhaustion, high/low blood pressure, nausea, blurred vision, diarrhea, forgetfulness, headaches, and many others. *Postural Orthostatic Tachycardia Syndrome (POTS)*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/16560-postural-orthostatic-tachycardia-syndrome-pots (last visited on July 23, 2020).

[5] "Ehlers-Danlos syndrome is a group of disorders that affect connective tissues supporting the skin, bones, blood vessels, and many other organs and tissues. Defects in connective tissues cause the signs and symptoms of these conditions, which range from mildly loose joints to life-threatening complications." The syndrome is associated with an unusually loose unstable joints that are prone to dislocation and chronic pain, abnormal scarring, highly stretchy and fragile skin, bleeding caused by unpredictable tearing of blood vessels and organs, and problems with the movement of blood and breathing. U.S. NAT'L LIBR. OF MED., https://ghr.nlm.nih.gov/condition/ehlers-danlos-syndrome (last visited on July 23, 2020).

and from climbing ladders, ropes, or scaffolds. *Id.* At step four, the ALJ found that Plaintiff could not perform her past relevant work. Tr. 25. The ALJ then proceeded to step five, where she determined that there were jobs in the national economy that a person of Plaintiff's age, education, and work experience could perform, such as a final assembler/optical goods, food and beverage order clerk, and dowel inspector. Tr. 26. Accordingly, the ALJ concluded that Plaintiff was not disabled.

## II. Analysis

Plaintiff argues that remand is warranted because the ALJ failed to properly evaluate the opinion of consultative physician Dr. Miller regarding Plaintiff's ability to frequently change positions, and substituted her own judgment for medical opinions of Plaintiff's primary treatment providers when she formulated Plaintiff's RFC. ECF No. 16 at 16-24. The Court concurs.

As a general matter, when determining a claimant's RFC, an ALJ must evaluate every medical opinion contained in the record. *See* 20 C.F.R. § 404.1527 (c). Generally, the ALJ must defer to an opinion of a claimant's treating physician when formulating the claimant's RFC. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (internal and other citations omitted). It has been long- recognized that the medical opinion of the claimant's treating physician is entitled to controlling weight so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(a)(2), (c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (internal citations omitted). If the ALJ determines that the opinion of a treating physician is not entitled to controlling weight, she must decide how much weight, if any, to give the opinion and must comprehensively articulate her reasons for the weight assigned to it by considering the so-

called *Burgess* factors.[6] *Halloran,* 362 F.3d at 32 (citations omitted). The ALJ's "[f]ailure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citation omitted). However, if a review of the record assures the Court "that the substance of the treating physician rule was not traversed," i.e., if the record provides "good reasons" for assigning less than controlling weight to it, the Court should affirm the ALJ's decision. *Estrella*, 925 F.3d 90, 96 (2d Cir. 2019).

In the present case, the ALJ recited a number of medical records of various medical providers, such as endocrinologists, cardiologists, neurologists, orthopedists, rheumatologists, and general practitioners, whom Plaintiff began seeing in 2012 when she started experiencing a wide range of symptoms that ranged from severe migraines and dizziness, to gastric obstruction, joint pain, and blurred vision. Tr. 19-25. Among such extensive medical records, there are two opinions in the record – one of Plaintiff's primary care physician Dr. Collier and the second one of Michael Ostolski (NP Ostolski), Plaintiff's family nurse practitioner. Tr. 24. The ALJ afforded little weight to both opinions because they were not consistent with the medical record as a whole and with Plaintiff's activities of daily living such as shopping. Tr. 24. As for NP Ostolski's opinion, the ALJ also noted that he was not an acceptable medical source. *Id.*

Specifically, Dr. Collier's opinion is a medical examination for employability assessment form issued on December 19, 2012, in which he opined that Plaintiff was "very limited" in most physical functional domains such as walking, standing, sitting, lifting, carrying, pushing, pulling, and climbing, as well as most domains of mental functioning. Tr. 984. He further indicated that Plaintiff's conditions diagnosed in June 2012, such as POTS, recurrent syncope, daily chronic

---

[6] The *Burgess* factors include (1) frequency, length, nature and extend of treatment, (2) the amount of medical evidence supporting the opinion, (3) the consistency of the opinion with the remaining medical evidence, and (4) whether the physician is a specialist. *Burgess*, 537 F.3d at 128.

severe diarrhea, recurrent migraines, intermittent left hemiparesis,[7] and hypoglycemia were expected to be permanent. Tr. 983. Dr. Collier also noted that Plaintiff was unable to adequately maintain her blood pressure in an upright position due to autonomic neuropathy.[8] Tr. 984. As for NP Ostolski's opinion, the record contains not one, but five assessments submitted from November 19, 2013 through May 14, 2016, in which he opined that Plaintiff was "very limited" in her abilities to walk,[9] sit, stand, lift, carry, push, pull, and bend, and was "moderately limited" in her ability to use hands. Tr. 969-81. Similarly to Dr. Collier, NP Ostolski opined that Plaintiff's IBS, migraines, Ehlers-Danlos syndrome, cardiac dysrhythmia, and endometriosis were permanent medical conditions that prevented her from working. *Id.*

It is well settled that the RFC need "not perfectly correspond with any of the opinions of medical sources cited in [an ALJ's] decision." *Matta v. Astrue*, 508 Fed. App'x 53, 56 (2d Cir. 2013) (summary order). However, when the ALJ rejects an opinion from a medical source concerning plaintiff's functional abilities, he or she must explain why the opinion was not adopted. *Dioguardi v. Comm'r of Soc. Sec.*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006) ("Under the Commissioner's own rules, if the ALJ's RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.") (internal citations omitted). Here, even though the ALJ did not completely disregard Dr. Collier's and NP Ostolski's

---

[7] "Hemiparesis is weakness or the inability to move on one side of the body, making it hard to perform everyday activities like eating or dressing" that can cause loss of balance, difficulty walking, impaired ability to grab objects, muscle fatigue, and others. *Hemiparesis*, AM. STROKE ASS'N, https://www.stroke.org/en/about-stroke/effects-of-stroke/physical-effects-of-stroke/physical-impact/hemiparesis (last visited on July 21, 2020).

[8] "Autonomic neuropathy is a group of symptoms that occur when there is damage to the nerves that manage everyday body functions [,such as] blood pressure, heart rate, sweating, bowel and bladder emptying, and digestion." *Autonomic Neuropathy*, U.S. NAT'L LIBR. OF MED., https://medlineplus.gov/ency/article/000776.htm (last visited on July 21, 2020).

[9] The November 13, 2013 assessment indicates that Plaintiff's abilities to walk and stand were "moderately limited" and that she had no limitations in her ability to sit and use hands. Tr. 981. Aside from this opinion, all other opinions completed by NP Ostolski listed Plaintiff's ability to sit, stand, and walk as "very limited," and her ability to use hands as "moderately limited."

opinions, her explanation of why their opinions, the only opinions in the record referencing Plaintiff's functional abilities, were disregarded is not convincing. First, it has been well recognized that opinions of nurse practitioners, although not technically deemed "acceptable medical sources," should, nonetheless, be evaluated on key issues such as impairment severity and functional effects. *See* SSR 06-03P, 2006 WL 2329939, at *2 (S.S.A. Aug. 9, 2006). Indeed, an opinion from a "non-medical source" who, like NP Ostolski, has seen the claimant in a "professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source," such as when "the 'non-medical source' has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole." *Id.* at *6. Here, the record demonstrates that NP Ostolski saw Plaintiff on a monthly basis from at least February 2013 through February 2016, determined her course of treatment, and, as part of it, prescribed medications and made referrals to various specialists to determine proper treatment of Plaintiff's complicated medical conditions. Tr. 547-22, 870-09.

The ALJ's justification for the little weight assigned to opinions of both providers was rooted in her conclusion that their opinions were inconsistent with the medical record, which, in turn, contained very few objective findings. Tr. 24. This conclusion was erroneous because Dr. Collier's and NP Ostolski's diagnoses of Plaintiff's impairments and their opinions as to Plaintiff's physical limitations stemming from such impairments were consistent with conclusions and diagnosis of numerous specialists Plaintiff saw during pendency of her applications. Admittedly, during the course of her treatment, Plaintiff's physical examinations were mostly unremarkable. Despite that, Dr. Collier and NP Ostolski, as well the specialists Plaintiff saw, diagnosed Plaintiff

with POTS, Ehlers-Danlos syndrome, IBS, severe diarrhea, chronic migraines, and other severe impairments, noted her debilitating symptoms associated with these impairments, and, at the very least, prescribed medications to treat her symptoms. Tr. 407, 414, 429, 457-59, 495-96, 500, 517-18, 550, 568, 656, 673-74, 676, 679, 734, 737, 770-73, 772, 775, 779, 879, 913, 922, 958, 966. For instance, Plaintiff saw three neurologists – Drs. Blitshteyn, Holmund and Hallowell – who, while noting Plaintiff's unremarkable examinations with normal MRI, EMG, and EEG, still repeatedly assessed her with neurocardiogenic syncope, POTS, Ehlers-Danlos Syndrome Type III, complex migraines equivalent to stroke, and migraines without aura. Tr. 43-56, 407-08, 492-94, 497.

Despite how complex Plaintiff's impairments were, the record contains evidence of objective medical findings, which corroborated the diagnoses of POTS and Ehlers-Danlos syndrome provided by Plaintiff's primary treating providers, as well as by the specialists she was treated by. In fact, as for Plaintiff's POTS and neurocardiogenic syncope diagnoses, the only available test to diagnose it – a table tilt test[10]– was performed by Plaintiff's neurologist Dr. Blitshteyn in May 2012.[11] Tr. 44-56. Similarly, Plaintiff's diagnosis of Ehlers-Danlos syndrome was not only supported by rheumatologist Dr. Robinson's observations of Plaintiff's unusually soft, hyper-elastic skin as well as by Plaintiff's numerous complaints of joint pain, but was also confirmed by the results of a genetic testing, which disclosed two genetic variants in a gene TNXB that has been implicated to cause Ehlers-Danlos Syndrome Type III. Tr. 734, 737, 935, 938, 940. Additionally, some of Plaintiff's conditions that she sought treatment for, such as migraines, were

---

[10] "POTS is often diagnosed by a Tilt Table Test, but if such testing is not available, POTS can be diagnosed with bedside measurements of heart rate and blood pressure taken in the supine (laying down) and standing up position at 2, 5 and 10 minute intervals." *Postural Orthostatic Tachycardia Syndrome*, DYSAUTONOMIA INT'L, http://www.dysautonomiainternational.org/page.php?ID=30 (last visited on July 22, 2020).

[11] Some of Dr. Blitshteyn's records were not available for the ALJ's review as they were submitted by Plaintiff to the Appeals Council. Tr. 42-57.

the impairments that are typically not diagnosed by clinical testing. *See Coulter v. Berryhill*, No. 15-CV-849A, 2017 WL 4570390, at *7 (W.D.N.Y. Sept. 5, 2017), *adopted,* No. 1:15-CV-00849 (MAT), 2017 WL 4541010 (W.D.N.Y. Oct. 11, 2017) (internal citations omitted) ("[T]here is no clinical test to confirm the existence of headaches."). The complexity of Plaintiff's impairments has also resulted in Plaintiff's referral to a variety of specialists, and eventually to Cleveland Clinic for a consultation about Plaintiff's abnormal insufficiency/dysautonomia syndrome[12] because of the lack of specialists that could deal "with her constellation of symptoms." Tr. 780. *See* SSR 16-3P, 2016 WL 1119029 (S.S.A. Mar. 16, 2016) ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent.")

The ALJ's rejection of Dr. Collier's opinion based on Plaintiff's ability to perform household activities, such as shopping, was also flawed because "plaintiff's ability to perform certain activities outside the house is 'a very weak basis' for the ALJ's rejection of the treating source opinion, because all of the activities that Plaintiff could do were performed at a rate other than eight hours a day, five days a week." *Kelsey O. v. Comm'r of Soc. Sec.*, 3:17-CV-525 (ATB), 2018 WL 3193197, at *6 (N.D.N.Y. June 28, 2018); *see also Henderson v. Berryhill*, 312 F. Supp. 3d 364, 370. In fact, Plaintiff testified that even though she shopped "every once in a while," she usually had someone accompany her while she was shopping. Tr. 67. Notably, the review of Plaintiff's daily activities paints a very bleak picture, which is far different from the one created

---

[12] On October 8, 2015, Dr. Rueda diagnosed Plaintiff with migraine and orthostatic hypotension dysautonomic syndrome that is a type of an autonomic disorder, which generally refers to an improper functioning of the autonomic nervous system that controls involuntary body functions such as heartbeat, breathing, body and skin temperature, digestion, hormonal and other functions. Tr. 780. *Dysautonomia,* CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/6004-dysautonomia (last visited July 22, 2020). It was Dr. Rueda, who referred Plaintiff to seek treatment at Cleveland Clinic.

10

by the ALJ, of a twenty-seven-year-old female. Plaintiff testified that due to anxiousness associated with experiencing her symptoms in public, particularly her frequent bathroom use, heat intolerance, and inability to sit and stand for a long time, she mostly stayed alone at the house watching TV, reading, writing, and talking to her cat. Tr. 65, 80. She did very minimal cleaning, no cooking, some laundry, and the only other household chore she could do was to feed her cat and change his litter box. Tr. 75, 78-79. She could not work because of the need to frequently use the bathroom, heat intolerance, and limited ability to sit and stand due to dislocation and pain in her joints caused by Ehlers-Danlos syndrome. Tr. 65. Plaintiff's IBS, gastroparesis, and POTS caused her to have diarrhea at least four times per week, as well as frequent nausea, vomiting, dizziness, and lightheadedness that could last for several hours. Tr. 70-73.

As for the opinion of consultative examiner Dr. Miller, the ALJ, though acknowledging and discussing it at great length in her decision, failed to assign any weight to it. This is problematic not only because the ALJ must evaluate every medical opinion received, *see* 20 C.F.R. § 404.1527(c), but also because this is not a case in which the Court can ascertan the ALJ's assessment of a medical opinion when the ALJ simply neglected to expressly assign a weight to it. *See Sweet v. Berryhill*, 1:15-CV-00866 (MAT), 2018 WL 1026230, *3 (W.D.N.Y. Feb. 23, 2018). The ALJ's failure to weigh Dr. Miller's opinion is particularly troublesome here because of Dr. Miller's recommendation that Plaintiff should avoid frequent position changes. Tr. 749. This recommendation was important in light of its consistency to the opinion with Dr. Collier, who stated that Plaintiff was unable to adequately maintain her blood pressure in an upright position based on autonomic neuropathy. It was also consistent with the numerous treatment records of Drs. Rueda, Cobler, Holmund, Hallowell, Robinson, and NP Ostolski, all of whom continuously noted Plaintiff's nearly disabling symptoms of lightheadedness associated with position changes,

fatigue, dizziness, and syncope episodes that stemmed from Plaintiff's diagnoses with POTS, Tr. 415, 457-59, 407, 550, 568, 734, 772, 779-80, 966, and with Plaintiff's hearing testimony where she testified that POTS caused her to experience dizziness, nausea, blurred vision, episodes of syncope and weakness that often lasted several hours and required her to immediately sit down and put her feet up in the air. Tr. 70.

The Commissioner argues that the ALJ's "implicit rejection" of Dr. Miller's opinion was justified because of Plaintiff's mostly unremarkable physical examinations and the requirement for Plaintiff to have a sit/stand at will option formulated by the ALJ in Plaintiff's RFC. ECF No. 18 at 13-16. Not only is this argument a clear example of a *post hoc* rationale that is frowned upon by the courts of this Circuit, *see Snell*, 177 F.3d at 134, but it also does not reconcile how the sit/stand at will option provided in the RFC accommodates Plaintiff's disabling lightheadedness and frequent syncope episodes caused by position change, as well as her frequent diarrhea and chronic migraines.

The Court acknowledges that in some circumstances it is appropriate for an ALJ to make an RFC finding without relying on a treating source opinion, particular when the record contains sufficient evidence from which the ALJ can access a claimant's RFC. *See, e.g., Monroe v. Comm'r of Soc. Sec.*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (it was not necessary for the ALJ to seek additional information regarding Plaintiff's RFC because the ALJ reached her RFC determination based on years' worth of contemporaneous treatment notes by Plaintiff's treating physician); *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order) (upholding the ALJ's RFC determination where the ALJ rejected physician's opinion but relied on his findings and treatment notes). Here, however, aside from the opinions of Dr. Collier and NP Ostolski as to Plaintiff's functional abilities, the record is devoid of a medical source statement or a formal

12

medical opinion as to whether or not Plaintiff was capable of performing the RFC formulated by the ALJ. *See Judd v. Berryhill*, 17-CV-1188, 2018 WL 6321391, at *7 (W.D.N.Y. Dec. 4, 2018) (remand is warranted where "the ALJ, who is not a medical professional, determined the RFC without a medical source statement or consultative examination report to assist her in correlating the medical treatment notes into an assessment of Plaintiff's physical capacity for work-related activities"). The RFC determination here lacks supports from any medical opinion as to Plaintiff's physical ability to engage in sedentary[13] work on a regular and continuing basis, i.e. work 8 hours a day, for 5 days a week. Without a discussion that relates the medical evidence of Plaintiff's dizziness, lightheadedness that limits her standing for long periods of time, syncope, chronic migraines with loss of vision, IBS, chronic diarrhea, fatigue, dislocation of joints, and numbness of her hands and feet, to the requirements of sedentary work, or the ALJ's reliance on a medical source opinion addressing Plaintiff's functional capacity to perform sedentary work, the Court does not have an adequate basis for judicial review.

Therefore, it is obvious that the ALJ substituted her own expertise of the medical proof for a competent medical opinion and formulated Plaintiff's RFC based on her reading of the bare medical evidence contained in the record. Because "the ALJ cannot arbitrarily substitute [her] own judgment for competent medical opinion," nor can she "set [her] own expertise against that of a physician who [submitted an opinion to or] testified before [her]," remand is the only appropriate remedy here. *Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) (internal citations omitted); *see also Rosa v. Callahan*, 168 F.3d.72, 79 (2d Cir. 1999) ("[T]he ALJ cannot arbitrarily

---

[13] The regulations provide that the full range of sedentary work involves lifting no more than ten pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. *See* 20 C.F.R. §§ 404.1567(a); SSR 96-9p, 1996 WL 374185, at *3 (S.S.A. July 2, 1996). Jobs are sedentary if walking and standing are required occasionally, meaning would generally total no more than about two hours of an eight-hour workday. Sitting would generally total about six hours of an eight-hour workday. SSR 96-9p, at *3. "Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity." SSR 96-9p, at *8.

substitute his own judgment for competent medical opinion.") (internal citations omitted). Accordingly, this matter is remanded for the Commissioner to reconsider reasons for not crediting any of the medical opinions regarding Plaintiff's physical limitations, and, if necessary, further development of the record about Plaintiff's exertional limitations during the pertinent time period. *See Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004) ("[W]here the ALJ failed to develop the record sufficiently to make appropriate disability determinations, a remand for further findings [that] would so plainly help to assure the proper disposition of [the] claim . . . is particularly appropriate." (internal quotation marks omitted)), *amended on reh'g in part, Butts v. Barnhart*, 416 F.3d 101 (2d Cir. 2005).

## CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings (ECF No.16) is hereby GRANTED, and the Commissioner's motion for judgment on the pleadings (ECF No. 18) is DENIED. This case is hereby REMANDED to the Commissioner for further proceedings consistent with this order. The Clerk of Court is directed to enter judgment and close the case.

IT IS SO ORDERED.

Dated: July 30, 2020
Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court